Good morning, Your Honor. Paul Derby for the appellant, Ian Mausner. My goal is to reserve five minutes. Not my goal to repeat the briefs, but what I'd like to do is point out the consequence of the position taken by the defendant or respondent, as well as the trial court. There are a couple of loose sentences that are dicta that have been cited for the proposition that a common law fraud claim in the state of California requires what is, in essence, the lost causation element of a statutory securities fraud claim. That is not the law, nor could it be the law, because if it were the law, then someone could simply avoid liability for the most egregious of common law frauds in the securities context by simply closing the door and preventing there from being a market effect. Someone could close the door and, in a direct conversation, without disclosing they were a paid shill for the publicly traded company, represent that the company was successful, that it's expected its stock would increase in price, that they were, in fact, trading alongside. So the consequence of your argument, counsel, is that no expert is required to prove the loss? Is that your point? It is. Both it is, and as well as simply just that we have stated and proven, at least for summary judgment purposes, the element of a common law fraud claim. The Dura Pharmaceuticals case that's cited by the defendant does not hold for the defendant. The language in Dura Pharmaceuticals is that while the common law fraud tort resembles, quote, unquote, resembles the 10b-5 claim, it is not identical. And the difference is that there is no loss causation element for the common law fraud tort, but there is a reliance element, which is presumed in the statutory securities claim. Making that claim easier on causation, you simply have to prove proximate causation or foreseeability, not a market effect. But in turn, you have to prove actual and justifiable reliance, which is presumed in the You have to prove the market effect. That market effect, I will concede, typically requires some sort of an expert. But you do not have to prove the reliance. You have to prove market effect, causation damages, loss causation, but not the reliance elements that you would in a common law fraud claim. Right, because that's fraud on the market. So, right, there are two different claims. And I think the concern is, did you plead the common law fraud claim with the specificity required by Federal Rule of Civil Procedure 9? The trial court, Judge Miller, before we had accepted Judge Storm's, resolved that on a motion to dismiss. Made us, in the case of certain stocks, go back and replete. In the case of certain stocks denied the motion to dismiss, we pled additional facts. And the defendant, in fact, did not even move to move to That complaint only included a subset of the facts that we would argue support the common law fraud claim. As I recall that, um, complaint, you included copies of the emails that were sent in the newsletter that talked about the various, uh, stocks and investments. We did. And the newsletters are in that sort of middle of the Venn diagram, if you will. They both support a market claim and they support a direct misrepresentation claim because they were sent directly to Mr. Mousner. But on the purely direct fraud side, and mind you, there are pages and pages of these allegations in the complaint. It's pages 5 through, I believe, 22 or 23 of the first amended complaint, the operative complaint, is the facts section on direct fraud. There is admittedly a market based claim. We pled that initially. That's pages 3 through 5 of the complaint. So the idea to at least me that the common law fraud cause of action snuck up on us and was first argued in the motion for summary judgment is a bit befuddling to me, given it's the emphasis of the complaint. Is there anything between the complaint and the response to the motion for summary judgment that addresses the common law claims discovery or anything else? There is, Your Honor. Mind you that we did not obviously draft the discovery. So there's no discovery that tries to get at the distinction between the third cause of action and the first two. There is a special interrogatory number two propounded by, I believe, Defendant Larry Eisen. And that is the interrogatory that I supplemented from the train ride back to Los Angeles from San Diego the day we were finally permitted Mr. Eisen's deposition on the last day of discovery. That's the interrogatory response initially. Mind you, that interrogatory asks for all the direct misrepresentations that we relied upon in buying the stock. It is necessarily a common law fraud-directed interrogatory because it asks about the very element of a common law fraud claim that doesn't exist in the context of a statutory securities fraud claim. We answered that interrogatory based upon the facts we then knew or surmised, the same that are stated in the complaint. That Mr. Eisen and the other defendants had promised they were investing alongside of us in these stocks while selling them off to make a quick buck. That he was in fact a paid shill by these companies without disclosing it. That he had in fact brokered a deal for us without disclosing he had had his securities license revoked about 17 years earlier. What we learned on February 21st, 2014, the day we were permitted Mr. Eisen's deposition, is that there was a lot more. Frankly, he's a bad guy. That he had been convicted thrice for securities fraud. That he was pleading out for a pump and dump at the very time he was making these direct misrepresentations to my client. Wasn't there evidence that your client knew that before February 21st when you supplemented the response to the interrogatory? There is evidence. There's counter evidence. So it's not, in my view, the type of on summary judgment. I understand that, but your representation here to us was that you just learned about it on that date and it sure seemed like there was some evidence that that had been known prior to that time and could have been known prior to that time. A significant number of the matters that we learned on February 21, 2014, were not known previously. So for example, Mr. Eisen had said that he had a wet-behind-the-ears CFA who was poring through the Edgar filings to know a lot about these companies, had never employed a CFA. In fact, he had never hired an employee ever. He said he had a team of people on the ground in China looking into these companies so that he knew them first-hand because he predominantly recommended Chinese penny stocks. No one, not a single person on the ground in China or frankly on the ground in any continent. He represented that he had a team of editors who were poring over his recommendations before they were made. No editors. He worked in an office the size of typical walk-in closet and had absolutely no employees. It was him and Mr. Barr basically showing companies that they were given stock in. All of that we learned on February 21, 2014. We also learned the full magnitude of his securities, his SEC infractions on February 21, 2014. Did we know the tip of the fraudulent iceberg? Absolutely. Did we know about all that was under the water? Not at all. On February 21, 2014, I had learned that by about 1.30 in the train ride back. We supplemented the interrogatory number two, which asked for the direct misrepresentation to identify all the additional information that we had learned previously. So what we knew, we disclosed in the complaint. What we learned on February 22, 2014, we disclosed that very day by me calling a colleague and having a colleague draft the supplemental response. The, mind you, I think there's a burden on the defendant to do a little discovery in this regard as well. I think it's plain on the face of the first amended complaint that there is a common law fraud claim, that it pleads direct misrepresentation, that it pleads reliance on those misrepresentations. I think there's a few things that simply the district court got wrong that are necessary to its ruling. For example, the district court said during the hearing on the motion for reconsideration that we did not plead a reliance element. That's plainly the district court and the defendant suggested that what I believe to be the critical cases, Vega, Person, Strebel, which are the California state law decisions that suggest that we are right and the district court is wrong as a state law, common law proposition. Those cases were not cited in opposition to the summary judgment motion. Of course they were. It was a whole section, pages 20 and 21 of our opposition brief. And so my suggestion would be, this is a completely inappropriate for summary judgment, that the district court's decision I think is founded on some misunderstandings as to what we pled, what we'd supplemented. The district court cited Coleman for the proposition, this court's decision in Coleman, for the proposition that it must be pleaded in the complaint or else it cannot be raised on summary judgment. That too is incorrect. Coleman suggests that either it has to be pleaded or identified in the discovery responses, which we did at the first moment available. What we knew we identified early, what we learned on February 21st through 2014, we identified the same day. When did you tell the district court you were abandoning the federal securities claims? At the motion for reconsideration hearing and in that briefing. There was motion for reconsideration. So the only reason you're in federal court on the common law fraud claims is because the court exercised supplemental jurisdiction over those claims? Correct. At the point we abandoned those claims, we could have sought a remand to the state court. We have no federal claims anymore. We abandoned those claims just given the simplicity of the common law fraud claim. I thought it was to the benefit of the court and both parties to simplify the case, shorten the trial, save expert costs, because frankly the evidence of direct fraud we thought was phenomenal. And as with any market-based claim, it's always a little tough. You have to have an expert come in and opine and they're always competing. So this was our reward for simplifying the case, was a summary judgment ruling in our disfavor. I'd like to reserve the rest of my time, if I may, for rebuttal. Thank you. Thank you. Mr. Chairman, may it please the court, Ian Friedman for respondents, Marked by LLC and Lawrence D. Eisen. Today I plan to discuss two main issues, which I think were just discussed during Mr. Derby's argument. First I'll discuss the fact that the district court correctly found that this has been a pump-and-dump scheme based on the fraud on the market since it began. And the appellant should not be now allowed, after losing a summary judgment motion, to reshape what they claim has been the claim since the beginning, when the plain facts and the complaint clearly show otherwise. Second, I'll argue that even were the court to consider this new fraudulent inducement theory, plaintiffs or appellants still cannot prevail because they cannot prove damages associated with that claim without an expert having been designated. With respect to your first point, can't a pump-and-dump scheme also constitute common law fraud? It certainly could, Your Honor, if it was alleged that way in the complaint and if defendants were given notice of that in supplemental discovery responses. When I was reading the complaint, there seemed to be a cause of action talking about fraudulent inducement. There is, Your Honor. Did you put your client on notice that they were talking about fraud and inducing them to purchase the stock? Well, Your Honor, if you reference the portion of the complaint which references the fraudulent inducement now alleged claim, so it's under a heading that says defendant made false statements directly to plaintiff and intended to induce plaintiff's reliance on these statements. However, if you look at the actual allegations in that portion of the complaint, I think it's helpful to go through each of the three companies which are still at issue So with, in regards to the Signalife Hartronics company, paragraph 36 of what appellants are now claiming was the fraudulent inducement portion of the complaint alleges that plaintiff understands that the increase in the share price from August 2007 to October 2007 was caused by defendants misrepresentations to plaintiff and other potential investors regarding Signalife. That's a pump. And then paragraph 37, plaintiff understands that defendants dumped their shares of Signalife Inc. subsequent to plaintiff's investment, contributing to its decline in share price. Yeah, and paragraph 27, which is the opening paragraph, talks about misrepresentation to the public, which would support your theory as well. But paragraph 29 refers to a telephone conversation that the plaintiff and bar had. And a telephone conversation is very, would be very different from something that was a fraud on the market. So if you have individualized conversations, that suggests a common law fraud theory rather than the fraud on the market scheme, doesn't it? It's difficult to say, Your Honor. Why is it difficult to say? Certainly it could read in isolation. But that kind of an allegation wouldn't support a fraud on the market theory, right? It wouldn't, Your Honor, and neither would the allegations that are under the fraud on the market portion of the complaint. If you look simply under the fraud on the market, where it says defendant effectuated the pump and dump stock manipulations, paragraph 15 references defendants making false and misleading representations directly to plaintiff with regard to. So it looks like we sort of blended some things here. Certainly, Your Honor. Okay. So you might look at the one that says, well, this was supposed to be a pump and dump. How come you're alleging that we talked to you, that you're making allegations about personalized conversations? And then when they have a section that deals with false statements made directly to them, you certainly have some evidence that might support the pump and dump. But that doesn't, but these allegations were all in a section called facts common to all causes. And it looks like it was just, it's just an effort more to give an overview of, of the, of the, of the schemes and their complaints about each of the companies. Because they then have four causes of action, which, which just say, we're just, we just repeat, you know, paragraphs, whatever it was, 1 through 99. And the first one's the 10B5. Number three is a common law cause of action. How could you not be on notice that they were alleging common law fraud when they have a heading called common law fraud? Yeah, I mean, what we tried to do was ferret out what it was they were complaining via the discovery responses. So the supplemental discovery interrogatory that Mr. Derby referenced asked the appellant to, do you claim you entered into any transaction identified in your response relating to each of the various companies based on your reliance on a statement made by MarketByte? If so, for each statement, please A, identify the statement, and subsection N, ask to state the reasons why the statement was misleading. If a statement was misleading because it fraudulently induced the appellant to enter into a transaction, it should have been stated in regards to subsection N. However, nothing in subsection N regarding any of the companies states that they were fraudulently induced to enter into, into the transactions. If we look at the response as to the Tapimune company, appellant states, they entered into the transaction, after referencing several of the alleged misstatements, quote, because they exaggerated the strength of Tapimune Inc.'s businesses, its future profitability, and the gains that could be realized by purchasing shares of the company. That's a pump. It then continues, in the days leading up to this OTC Journal newsletter, MarketByte sold 70,000 shares of Tapimune stock. That's a dump. The, the same thing can be said for the China Energy stock and the Signalite stock. Now, let's go back to China Energy and look at paragraph 47. That says, based on EISEN's October 3, 2008, email, plaintiff purchased additional shares of China Energy. Certainly, Your Honor. And if you. That sounds like reliance. It, but if you look at the discovery response, it references a number of the appellant was, sorry. So, asked why it was misleading. It says, appellant was, or respondent exaggerated the strength of the company's current businesses, future profitability, and the gains that could have been realized by purchasing the company. That's a pump. That's, we're, well, all of the. Why is it limited to a pump? Why can't it be a common law fraud? Because we asked in the supplemental, or in the special interrogatory for them to put us on notice. I just, does someone have a radio on in here? Thank you. Thank you. Your Honor, we, we asked in the special interrogatory for them to put us on notice of all of the reasons why any individualized statement was misleading. The only reasons we were ever given in the special interrogatory, which appellant now wants to rely on, was that the statements were related to a pump and dump scheme. There is nothing in that special interrogatory which relates to the fraudulent inducement claim. This is, so let's just step back for a second. I, you know, we, you file these complaints and you allege four causes of action, and then you conduct discovery. And then, as you proceed in conducting discovery, you realize some claims are better than other claims, or might be more triable. And, just setting aside the motions for summary judgment, ultimately you get to a point where you have your pretrial conference report, and you prepare this thing, and it says, these are the issues that are going to be tried. Plaintiff, you know, abandons these two claims, and then they're held to that. And this case hadn't gotten to that point yet, right? We had gotten to the discovery cutoff point. We had not gotten to the pretrial conference. Right. And at the end of the discovery cutoff point, it's quite apparent that given the fact that they hadn't come up with the expert, which was required for the two securities fraud actions, they decided to, they would go to trial on their common law claims, which did not require an expert. All it required was I paid X, and I lost, you know, I sold at X, and I lost this much, and it was all because I was fraudulently induced into buying the stock at this high thing, and continued to hold it, because allegedly, I mean, I know this is a dispute, Eisen was saying, well, I'm holding mine, and still writing directly in newsletters, you know, saying this is a great stock. I mean, the case hadn't gotten to a point where you clarify which claims are going to proceed to trial and which claims are not. And I don't know what happened here, because they, the magistrate judge's opinion doesn't really address all four claims. It really just focuses on the federal claims. And I, you know, maybe because the case was originally pled that way, but cases develop, and that's why you get to the point where you decide, okay, this is what's in the case, and this is what's not in the case. Your Honor, I understand that, and I think if we can look at the expert situation, even were this only the common law fraud claim, appellants still can't prevail without an expert, because, so first the appellants, they now argue that they wouldn't have entered into the transactions had they been privy to certain omissions or misstatements. And then they're, in the complaint, they still argued that once they purchased the securities, that statements by respondents increased the cost of the shares, and then once they sold, they decreased, respondents sold at the peak of the market and dumped, essentially. So even if appellant now only claims that they wouldn't have bought the shares, they're still only entitled to recover from respondents, damages which respondents actually caused. Here there's, we're dealing with investments which were made in one of the worst financial markets that the country's seen in quite some time, and without an expert, they're unable to separate market fluctuations from damages actually caused by the respondents. For instance, if they had bought the shares, even with the same omissions, same alleged misstatements, held on to the shares, but were in a great financial economy, it's likely those stocks could have gone up, then there's no damages. But here where there's a bad financial economy, they hold the stocks for a period of time, they go down, there's still have to prove what caused those specific damages. The cases relied on by appellant, the Person case, the Stribal case, and the Vega case, don't actually support the fact that they don't need an expert to prove their opinion. The Person case, the important distinguishing there is it was a ownership of a closely held corporation, not subject to market fluctuations. We're dealing with a transaction between two 50% shareholders in a closely held corporation. There at page 1166 of the Person case, the court states that the non-disclosing shareholder was, quote, correct in pointing out that if damages do not flow from the concealment, but rather from some other extrinsic factor, the award of damages would be improper. Here we're dealing with an extrinsic factor, which is the overall market for these securities. It seems to me that would be what your client would have to show. The evidence he's showing that's in here already is that when inducing him to sell, he said, and I'm with you on this investment. I made affirmative, I am not going to sell. And then he sold. And that in this situation, we also have, unfortunately, it seems rather complicated that your client was holding himself out to be a broker and was actually brokering some of these deals on behalf of Mosner. So that makes him somewhat of a fiduciary. And he didn't ever told him that he sold. So Mosner can argue, I lost because I didn't sell when I didn't sell, and he had an obligation to deliver. And whatever the market forces were, they impacted them equally. And had he yet had he sold at the same time I hadn't sold, then he wouldn't have suffered these damages that he suffered by not doing so. Well, Your Honor, that's the, I think that gets back to the pump and dump claim a little bit. I think here it's still appellant's burden to show that my client has caused him any damages. Without an expert, he can't show that any of the losses were caused by my client and not caused by the separate just overall market. The exact situation is actually discussed in the, it's a Safeco Insurance Company versus J.D. painting, and it's cited in the Stribal decision on which appellant relies. There the court, quoting Safeco, states, it is conceded appellant might be he would have been able to sell his house earlier for more than he can now obtain. The rule for recovery in tort has never rested solely on but-for causation, but has also been based on proximate cause. The court goes on to say, a superseding cause, utterly unrelated to the defendant's negligence, breaks the chain of proximate causation and is a bar to recovery. Here, appellant has a burden to show that there was not a superseding cause such as the overall market condition. I know, I think superseding cause is a defense. I just went through this in a case. And I, and I, and that seems to be way beyond anything that the district court reached. Is there any discussion of superseding causes in the district court's decision? There, there's none. There, there hasn't been. It seems to me that the district court dealt with this very, very quickly and very superficially. Unfortunately, because the appellant had no ability to establish the losses actually. But the district court proceeded on the presumption that a, that an expert was required. And that, and that seemed to be derived from the 10b-5 claim to which the district court gave a, a great deal of attention. And, and the district court gave that great deal of attention because all of the claims that to that point had been reliant on that fraud on the market theory. So, just lastly, touching briefly on the, on the Vega decision. That case was a dem, held on a demur. There was no discussion whether the the appellant needed an expert to. Do you have any case in which the California court has said that in a common law fraud claim, you do have to have an expert? If. I understand why you think these cases are distinguishable, but that doesn't exactly establish an affirmative case. The only. That may leave us in a position in which there's no law on point. Well, the closest law on point, your honor, is in both the stribal and the person. Cases where the damages component in those cases was established with an expert. Person in particular. You mean they did use an expert there to the court? The court said you had to have one? Or otherwise your case would have failed? They did not, but there, there hasn't been a, a claim where there, the court said you don't need an expert either. In person, the entire damages calculation was laid out by expert opinion in the first two paragraphs of the discussion. Thank you. All right. Thank you, counsel. I think you had a couple minutes left. Your honors, with regard to the damages claim, I think the panel's already made a couple of the points that I desire to, which is that it's a defense burden to prove intervening or some other cause. I think it's actually the defense who would have to submit an expert on the collapse of the market. California Civil Code 3343, the prevailing Casey instruction, the cases that we've cited, suggest that one measure of damages is simply Mr. Mousner's out of pocket loss. If we buy a car for $20,000 and we're knowingly sold a lemon, we have an obligation not to also sell a lemon unknowingly to the next person, but a duty to mitigate. We buy the car for $20,000, sell the car for $4,000. Our damages are $16,000. No expert is required. We don't need an auto industry expert, and we certainly don't need to know an effect on the prevailing used car market to claim those damages. Out of pocket is simple. There are zero cases cited by the district court or the defendant after briefing a summary judgment motion, a motion for reconsideration, and this appeal that have held that a common law fraud claim requires that sort of an expert. With regard to pump and dump, I made confessions at the district court level and they were held against me. I'm going to try it here. If the argument is that we alleged a pump and dump, and you can pick certain paragraphs out of the first amended complaint that regard a pump and dump, guilty as charged. We claimed it. We pleaded it. We tried to support it. But not every claim, and in fact most of the claims, don't involve a pump and dump. With regard to signal life, paragraph 30 is an e-mail. Paragraph 31 is a direct PowerPoint provided to my client. Paragraph 32 was an in-person meeting. In fact, on signal life, inexplicably the district court said we had no evidence of any misrepresentations and dismissed that claim for a complete lack of evidence. Yet Mr. Mousner submitted a declaration that he met with Barr on the morning of October 1st, 2007, and received these various misrepresentations. He has a calendar entry from 10 a.m. on October 1st, 2007. Ginsburg. Real quick. So the district court dismissed Barr, and I found that, gentlemen, not clear. Was Barr, was he making representations to your client? He was. He was an owner, albeit 1 percent, in Market Byte. The entire time or a portion of time, or with respect to three, all three of the holdings, or? All three. Mr. Eisen certainly was the primary perpetrator of the fraud, and the 99 percent owner of Market Byte. But certainly, for example, on October 1st, 2007, Barr started the conversation in person in the morning at 10 a.m., handed that off to Mr. Eisen. And the only uncertainty in my client's mind is he couldn't recall if it was one or two telephone conferences that occurred in the afternoon, October 1st, 2007. But he knows he got a phone call, and that he was told about the stock, that it was directly promoted by Mr. Eisen, because that's what caused him to invest in the stock. In fact, his testimony, his declaration was that he trusted Eisen more because Eisen held himself out as a market expert, whereas Barr didn't make such grand proclamations about his experiences in securities or his knowledge of these particular stocks. But that's quite detailed, years later, in terms of a recollection. Do you need us to read to... Are you asking the court to reverse this to Barr as well? We are. Mr. Barr didn't even show. Mr. Barr didn't move for summary judgment. I agree that if there is a legal proposition that precludes us from continuing with this case, that would likely apply. If we, for example, can't prove our damages in the common law fraud context, and we've abandoned our statutory claims, that would assist Mr. Barr, whether he was present or not. But he didn't actually move for summary judgment. He no-showed, didn't submit a brief. And so it caught us... We struck us a little odd, Mr. Barr. It was a sua sponte dismissal, Mr. Barr. It was. It was. Yeah. So, Your Honors, I... Again, I just return to the idea that to embrace the district court's concept is to basically say, if you close the door, you can freely commit a common law fraud in the connection of securities. That's plainly not the law in the state of California. All right. Thank you, counsel. Your time is up. This session, this particular session of court for today is adjourned. And we will re-adjourn at 1030 this morning. Thank you.
judges: Wardlaw, Bybee, Zipps